UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHANNON DAVIS ,

                Petitioner,             **DECISION AND ORDER**
                                       **No. 07-CV-6174(VEB)**

    -vs-

THOMAS POOLE,

                Respondent.
_____

## I.      Introduction

    Proceeding *pro se*, Shannon Davis ("Davis" or "Petitioner") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state custody pursuant to a judgment of conviction following a jury trial on charges of second-degree attempted murder (Penal Law §§ 110.00, 125.25(1)), first-degree assault (Penal Law § 120.10(1)), second-degree criminal possession of a weapon (Penal Law § 265.03(2)), and third degree intimidating a victim or witness (Penal Law § 215.15(1)). On June 28, 2002, Davis received concurrent nineteen-year sentences for the attempted murder and assault convictions, which he is still serving. He received lesser concurrent sentences on the other convictions.

    The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.     Factual Background

    Under Indictment No. 01-1663-001, Davis was charged with Attempted Murder (Penal Law §§ 110, 125.25(1)), Assault in the First Degree (Penal Law § 120.10 (1)), Criminal

Possession of a Weapon in the Second Degree (Penal Law § 265.03 (2)), and Intimidating a

Victim or a Witness in the Third Degree (Penal Law § 215.15(1)). A summary of the trial

proceeding follows.

James Smith ("Smith") had known Petitioner for about two years prior to the incident,

and had been to his house fifteen or twenty times (42, 82-83).[1] Carrie Pecoraro ('Pecoraro') lived

with Smith during the nine months leading up to July 21, 2001, and had seen Petitioner many

times (104-105).

On July 21, 2001, Smith sold Petitioner a refurbished air conditioner for $90. Petitioner

gave him $30, and agreed to pay him the rest later that day (35). That night, Smith called

Petitioner's pager, and Petitioner returned the call. Smith, hoping to collect the $65-balance,

deceived Petitioner by telling him that he knew someone who was looking to purchase cocaine.

Smith himself had purchased cocaine from Petitioner in the past (32-33, 43, 46).

Later that night, Pecoraro was outside walking her dog, and Smith was waiting outside

for Petitioner (47-48). Shortly after 1:00 a.m., Smith and Pecoraro saw a black Oldsmobile

Aurora pull up to the curb (44, 117). Although Smith was not certain, he thought that Bernard

Brooks ("Brooks") was in the Aurora (44-45). Smith knew Brooks, and knew that Brooks was

Petitioner's friend.

Then, a a white car that pulled into the driveway with Petitioner as a passenger (44).

Pecoraro saw Petitioner as the car pulled in all the way to the back. Petitioner asked Smith where

the customer was, but Smith insisted on getting his money first. Instead of paying him, Petitioiner

pulled out a gun and started shooting (51-53). After the last shot, Petitioner said, "Fuck with me

---

[1]     Numbers in parentheses refer to pages from the transcript of Petitioner's trial.

now" (58).

When Pecoraro heard the gunshots, which sounded like, "pops," she hid in the bushes. She then saw Petitioner's car pulling out of the driveway. Someone from that car yelled toward the black Oldsmobile Aurora, "[L]et's get out of here" (119).

Smith yelled to Pecoraro that he had been shot. Pecoraro called 911 for him, observing that Smith was bleeding badly. Smith described Petitioner for the 911 operator, but did not identify him by name. At some point, Smith became unresponsive, and the call ended.

When the police arrived, Smith and Pecoraro told the police that Shannon Doyle shot Smith. Smith gave the defendant's last name as Doyle, because he knew that was the last name of Petitioner's mother (42, 210). Smith described Petitioner and gave police his address. Petitioner described the car that the defendant had been in, and mentioned that a wheelchair was in the back seat (210-211).

While Smith was being treated at the hospital, he was fading in and out of consciousness (64). One bullet had entered the right side of his abdomen about six inches above his waist (55). Other bullets had caused nerve damage that inhibited movement of all small muscles in his right hand. Smith ultimately underwent eight hours of surgery (56-57, 142-143).

The police took a statement from Pecoraro and showed her a photographic array. Pecoraro, however, did not select Petitioner because, she said, she had gone "blank" (123). Pecoraro said that she was frightened, and that no one would tell her whether Smith was going to live or die (123, 126-127, 131).

Petitioner's mother went to visit Smith at the hospital (67-68). Brooks, the person whom Pecoraro saw in the black Oldsmobile Aurora on the night of the shooting, went to see Smith two

or three times (67-68). As a result of these visits, Smith testified that he was becoming fearful, and so he checked out of the hospital early.

Brooks and Petitioner were outside the front of the hospital when Smith checked out (67). Concerned for his safety, Smith decided to stay in a hotel for a few days. He eventually returned to his home, but did not sleep there (81). Smith then contacted Detective Gary Teague to tell him where he believed Petitioner to be staying. Detective Teague and other officers then arrested Petitioner at his residence at 31 Kerns Street (69-70, 219).

A felony hearing was scheduled for August 3, 2001, which Brooks attended. Before the hearing, Brooks followed the victim, Smith, into the men's room and threatened him (70-71). Deputies eventually removed Brooks from the building. Smith ultimately identified Petitioner at the hearing and the directed that the case be presented to the Grand Jury (71-72) .

Three days later after the felony hearing, on August 6, 2001, someone from Petitioner's cellblock placed a telephone call directly to Smith's home at 4:23 p.m. (33, 161). Later, at around 7:00 p.m., Petitioner called his own home and a three-way call was placed to Smith's home phone number (72, 153-154, 157, 163-164).

In the three-way phone call, Petitioner offered to take care of Smith if he would drop the charges. Petitioner also warned Smith of the consequences of proceeding with the criminal prosecution: "[Y]ou don't want to have your ass out on Front Street" (73). Smith interpreted that to mean that he would be shot again if he testified against Petitioner (73).

Smith testified that hearing Petitioner's voice made him fear for his life (74). Smith immediately called a friend of his, Father Boyer. According to Father Boyer, Smith sounded highly agitated and distressed (205). "He was in panic, his voice was trembling. I have never

heard him in such a state" (206).

### III. Standard of Review under 28 U.S.C. § 2254(d)

When a petitioner "in custody pursuant to the judgment of a State court" seeks habeas review of "any claim that was adjudicated on the merits in State court," a habeas writ may issue only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law as determined by the Supreme Court if either (a) "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law," or (b) "the state court considers facts that are materially indistinguishable from a relevant Supreme Court case and arrives at an opposite result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). An "unreasonable application" of clearly established federal law occurs if (a) " 'the state court identifies the correct governing legal rules from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,' " or (b) the "state court invokes a Supreme Court case and unreasonably extends its legal principle to a new context where it should not apply, or fails to extend it where it should apply." *Williams*, 529 U.S. at 407.

### III. The Exhaustion Requirement

A habeas petitioner must have exhausted all state remedies before seeking federal habeas relief. See 28 U.S.C. § 2254(b)(1); *Daye v. Attorney Gen'l of N.Y.*, 696 F.2d 186, 190 (2d Cir.1982) (*en banc*), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). In order

for a claim to be considered exhausted, it must have been presented fully and fairly in federal constitutional terms to the State courts. *See*, *e.g.*, *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye*, 696 F.2d at 191.A claim is exhausted if it has been "fairly presented" to the state court. *Daye*, 696 F.2d at 191. To fairly present a federal constitutional claim, the petitioner must have set forth for the state court all the essential factual allegations and legal premises now being asserted in federal court. *Id.* "

IV.     **The Adequate and Independent State Ground Doctrine and Procedural Default**

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (citations and internal quotations omitted). Even where the state court also considers a petitioner's arguments on the merits, that is of no moment because "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." *Harris*, 489 U.S. at 264 n. 10; *accord Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991);

*Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir.2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995).

To show a "fundamental miscarriage of justice" requires a demonstration of "actual innocence." *See*, *e.g.*, *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (citing *Sawyer v. Whitlety*, 505 U.S. 333, 339 (1992) (."The miscarriage of justice exception is concerned with actual as compared to legal innocence."). The Supreme Court has emphasized that the exception has a "narrow scope," *Sawyer*, 505 U.S. at 339. "To be credible," a claim of actual innocence must be based on reliable evidence not presented at trial[,]" *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995); *accord Calderon*, 505 U.S. at 339.

## V.     Analysis of Petitioner's Habeas Claims

### A.     Ground One: "Prosecutorial Misconduct"

On direct appeal, the Appellate Division held that Petitioner not preserved his various challenges to the prosecutor's summation, and declined to review these claims in the interest of justice. Respondent argues that the Appellate Division's decision rested upon rested on an adequate and independent state procedural ground**,** thereby precluding habeas review. I agree. *See Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996) (holding that the failure to object to the prosecutor's statements in opening and on cross-examination constituted an adequate and independent state ground). Because there is an adequate and independent finding by the Fourth Department that Davis procedurally defaulted on these claims, Davis would have to show in his habeas petition "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750.  **This he cannot do.**

Although attorney ineffectiveness can constitute cause, it must be true ineffectiveness in the constitutional sense, and the claim of ineffective assistance of counsel must itself be fully exhausted. Davis does not have a meritorious, exhausted claim of ineffective assistance of trial counsel sufficient to constitute cause for purposes of excusing the procedural default. Furthermore, he has failed to demonstrate actual prejudice. Finally, he has come forward with no reliable, new evidence of actual innocence so as to warrant the "fundamental miscarriage of justice" exception. Therefore, Davis's prosecutorial misconduct claims are barred from habeas review.

### B. Ground Two: "Ineffective Assistance of Trial Counsel"

#### 1. Overview of the *Strickland* Standard

In order to prevail on a Sixth Amendment ineffectiveness claim, a defendant must prove (1) that trial counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. In *Strickland*, the Supreme Court said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Thus, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *accord, e.g., Bell v.*

*Cone*, 535 U.S. at 698. A divided Second Circuit panel recently reiterated that court's previous holding that application of the New York state standard, *e.g.*, *People v. Baldi*, 54 N.Y.2d 137, 146, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981), is not "contrary to," 28 U.S.C. § 2254(d)(1), the principles set forth in *Strickland*, which has been deemed to be the "clearly established" Supreme Court law for evaluating claims of ineffective assistance of trial counsel. *Rosario v. Ercole*, 601 F.3d 118, 126 (2d Cir. 2010) ("*Rosario I*") ("We emphasize again that the New York state standard for ineffective assistance of counsel is not contrary to *Strickland*.") (citing *Eze v. Senkowski*, 321 F.3d 110, 123-24 (2d Cir. 2003); *contrasting with Henry v. Poole*, 409 F.3d 48, 70 (2d Cir. 2005) (recognizing that "in the absence of a contrary decision by this Court *en banc*, or an intervening Supreme Court decision, we are bound to follow the precedents . . . that the N[ew]Y[ork] Court of Appeals standard is not 'contrary to' *Strickland*")).

With relief under the "contrary to" clause not available to Davis under these circumstances, given the Second Circuit's most recent pronouncement in the *Rosario* cases, the remaining issue, then, is whether Petitioner can obtain relief on the ground that the state court's adjudication of his claim involved an "unreasonable application" of *Strickland*. The Second Circuit has stated that the level of "unreasonableness" that must be shown under 28 U.S.C. § 2254(d)(1) "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008) (quoting *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir.2002)). As the Circuit further explained in *Eze v. Senkowski*, 321 F.3d at 121, an unreasonable application of Supreme Court precedent means more than that the state court incorrectly applied the precedent; it had to apply the facts in an "objectively unreasonable manner." *Id.* There must be "some increment beyond error is required," although it "need not be

great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (internal citations omitted).

### 2. Analysis of Trial Counsel's Alleged Errors

#### a. Failure to Request a Suppression Hearing

Petitioner's finds fault with trial counsel's failure to request a suppression hearing to challenge Pecoraro's non-identification of him after being shown a photo array. Although Petitioner acknowledges that Pecoraro admitted at trial that she was unable to identify him during the photo array (123), he argues that trial counsel nevertheless should have challenged the photo array procedure. Petitioner does not identify the grounds upon which trial counsel allegedly should have challenged the photo array. Petitioner cannot demonstrate either that trial counsel was deficient in failing to make what would have been a meritless motion. Furthermore, he cannot demonstrate how he was prejudiced by trial counsel's failure to challenge the photo array procedure: A motion to suppress would have been futile since there was no pre-trial identification to exclude. Petitioner accordingly has not demonstrated ineffective assistance in this regard. *See* Resp't Mem. at 13 (Dkt. #7).

#### b. Failure to Object to Testimony Regarding Petitioner's Drug Dealing

Next, Petitioner claims that trial counsel "set out to sabotage" his case when counsel "wrongfully assented" to the prosecutor's motion to adduce evidence of uncharged crimes–namely, Petitioner's "alleged uncharged crime of selling drugs." In other words, Petitioner claims that trial counsel should have objected to Smith's testimony that Petitioner had sold him drugs in the past. As Respondent points out, an objection likely would have been

overruled as a matter of state evidentiary law because the trial court reasonably could have determined, as a matter of law, that the testimony was relevant to explain why Petitioner was coming over to Smith's house at night without the money Smith said Petitioner owed to him–because Smith had told Petitioner that he had a drug buyer for Petitioner. *See People v. Till*, 87 N.Y.2d 835, 837 (N.Y. 1995) ("[I]t cannot be said that the trial court erred as a matter of law in admitting testimony concerning a robbery allegedly perpetrated by defendant immediately prior to his apprehension by the police. The evidence of the uncharged robbery, which was admitted for the expressly instructed limited purpose of a background explanation, established a motive for defendant's attempt to kill or assault an off-duty police officer to avoid capture and punishment; thus, for the jury to have a thorough appreciation of the interwoven events leading to defendant's culminating criminal conduct and of the competing theories of what happened and why, the closely antecedent, uncharged robbery was relevant and material."). Thus, Davis cannot demonstrate the required prejudice.

### c. Failure to Make "Fair Cross-Section" Motion

The third error ascribed to trial counsel is the failure to make a "fair cross-section" challenge to the jury pool on the basis that it contained no African-Americans. Petitioner concedes that trial counsel did challenge the racial composition of the jury pool, but asserts that the motion should have been in writing. Petitioner also alludes to the failure to preserve an equal protection claim concerning the jury pool.

To establish a prima facie case of a viable "fair cross section" claim under the Sixth Amendment, the petitioner must demonstrate that the under-representation of the racial group claimed to be excluded is the result of "systematic exclusion of the group in the jury selection

process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren, 439 U.S. at 364.

Under the Equal Protection Clause, the petitioner also bears the burden of showing that the selection procedure is not racially neutral, i.e., is the result of intentional discrimination by the state. *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir.1986); *Castaneda v. Partida*, 430 U.S. 482, 494-95, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (holding that in order to show that equal protection violation has occurred in context of grand jury selection, defendant must show that procedure employed resulted in substantial underrepresentation of his race or of identifiable group to which he belongs).

Davis has not established two of the required elements of a prima facie case under the Sixth Amendment fair cross-section provision; stating that there were no African-Americans in his jury pool does not establish that the representation of this group in venires from which juries in Erie County are selected is not fair and reasonable in relation to the number of such persons in the community or that the alleged underrepresentation was due to the systematic exclusion of the group in the jury-selection process. Thus, Davis cannot demonstrate how he was prejudiced by trial counsel's failure to make a fair cross-section motion in writing; even if it had been a written motion, in all likelihood it would have been denied.

Furthermore, Davis has not offered any allegations in support of the critical element of "intentional discrimination" with regard to a possible equal protection claim. Thus, Davis cannot demonstrate how he was prejudiced by trial counsel's failure to make an equal protection challenge to the jury pool.

### d. Failure to Object to Prosecutorial Misconduct

Fourth, Petitioner claims that trial counsel erred in not objecting to "all the misconduct" that the prosecutor committed. Trial counsel did object to one improper comment, and the trial court sustained the objection and issued a curative instruction. Petitioner is correct that the remainder of the remarks he finds offense went unchallenged.

Under New York State law and Federal law, prosecutorial misconduct must affect the fundamental fairness of the trial in order to warrant reversal. *E.g.*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (In order to overturn a conviction, the prosecutor's comments must constitute more than mere trial error and instead must be so egregious as to violate the petitioner's due process rights). In determining whether a prosecutor's misstatements "so infected the trial with unfairness as to make the resulting conviction a denial of due process," the Second Circuit has instructed reviewing courts to consider various factors such as the severity of the misconduct, the sufficiency of any curative judicial instructions, and the likelihood that the misconduct affected the outcome of the case. *Agard v. Portuondo*, 117 F.3d 696, 713 (2d Cir.1997), *rev'd on other grounds*, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000); *see also Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998); *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (*per curiam*). For the reasons that follow, the Court concludes that Davis' trial was not so infected by unfairness that the resulting convictions

amounted to a denial of due process.

First, Petitioner argues that the prosecutor improperly made what is sometimes called a "safe streets" argument. However, as Respondent argues, the prosecutor did not portray the defendant as a continuing community menace, or ask the jury to remove him from society to prevent future violence. The prosecutor argued that Smith, based upon the testimony that he was shot by Petitioner and threatened by Petitioner and Brooks, "had little to gain and plenty to fear by continuing to seek justice." The testimony upon which the prosecutor relied included the following incidents: (1) Smith he left the hospital early out of fear, only to see the defendant and Brooks in front of the hospital; (2) Smith stayed at a hotel for a few nights, and did not sleep in his own residence after that; (3) Brooks threatened Smith on the day of the felony hearing, and on subsequent occasions; and (4) three days after Smith identified Petitioner at the felony hearing, Petitioner called him from the jail and threatened him.

"Under New York law, a comment that a witness has no motive to lie does not constitute vouching for the witness's credibility." *Archer v. Fischer*, No. 05CV4990(JFB), 2009 WL 1011591, *21 (E.D.N.Y. Apr. 13, 2009) (citing, *inter alia*, *People v. Evans*, 192 A.D.2d 671, 672, 597 N.Y.S.2d 90 (N.Y. App. Div.1993) (holding that remarking on witness's lack of motive to lie is proper or does not constitute vouching); *People v. Franklin*, 188 A.D.2d 662, 662, 592 N.Y.S.2d 267 (N.Y. App. Div. 1992) (same); *People v. Lucas*, 162 A.D.2d 273, 274, 556 N.Y.S.2d 629 (N.Y. App. Div.1990) (same); *People v. Stephens*, 161 A.D.2d 740, 741, 556 N.Y.S.2d 353 (N.Y. App. Div. 1990) (same)). Thus, any objection likely would have been overruled. Moreover, the argument does not constitute reversible misconduct. *See Archer*, 2009 WL 1011591, at *21 (denying habeas relief on claim of improper vouching where the prosecutor

did not improperly vouch for witnesses, but merely suggested that the prosecution witnesses had no motive to lie).

Second, Petitioner complains that the prosecutor speculated that Brooks knew that the defendant shot Smith. As Respondent argues, the following evidence about Brooks, fairly admitted without objection, enabled the prosecutor to make that argument: (1) Smith testified that Brooks and Petitioner were friends; (2) Smith thought that he saw Brooks in the car (the black Oldsmobile Alero) that drove up and parked on the street at the same time that Petitioner pulled into Smith's driveway (45); (3) after Smith was shot, a person sitting in Petitioner's car yelled to the occupants of the Oldsmobile to "get out of here"; (4) Brooks went to check on Smith at the hospital, confirming his awareness that Smith was shot; (5) Brooks was outside the hospital with Petitioner when Smith was released; and (6) Brooks caught up with Smith in the men's lavatory and threatened him, and proceeded to threaten him on three or four subsequent occasions. Although it is "clear that it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence," *United States v. Rosa*, 17 F.3d 1531, 1548-49 (2d Cir .1994); *accord Tankleff v. Senkowski*, 135 F.3d 235, 253 (2d Cir.1998), here the prosecutor did not go outside the bounds of the "four corners" of the evidence in making the above argument regarding Brooks.

Third, Petitioner states that the prosecutor committed misconduct by stating that Petitioner may have been hiding with Brooks after the shooting. Respondent argues that the prosecutor's remark was based on available inferences, and was responsive to defense counsel's own speculation that was unsupported by evidence; counsel noted that the police did not arrest Petitioner immediately and commented, "[F]or all we know he was at his house the entire time"

(257).  Respondent argues that there had been no evidence that Petitioner was at home; rather, Smith had testified that he told the police where Petitioner lived on the day of the shooting. Petitioner and Brooks were friends, and Brooks may have been at the scene of the shooting. Brooks showed up more than once at the hospital, and threatened Smith more than once. He was with Petitioner outside the hospital when Smith was discharged, and he showed up for the felony hearing. Smith called Detective Teague some time after he was discharged from the hospital, and told him where he thought Petitioner might be. Petitioner was finally arrested where he lived.

From this evidence, the prosecutor provided an alternate possibility to counsel's speculation that the defendant had been home: "I submit to you, [he] was on the run and in hiding. Maybe he was over at Bernard Brooks' house" (292). Respondent argues that the remark was based on evidence and inferences, however strong or weak, and that it countered the defense suggestion which was not based on evidence at all.

Trial counsel did not object. The court discussed this remark with counsel when the summation was completed. Defense counsel asked for an instruction that summations are not evidence (301), and the trial court instructed the jury that arguments of counsel were not evidence and that the jury could disregard arguments that were not based on the evidence, not reasonable, and not consistent with the testimony or the law (309). Trial counsel did not object further after the instruction was given. Clearly, trial counsel should have objected immediately to this comment, which was improper. However, it was not a flagrant transgression warranting reversal.

Finally, Petitioner argues that the prosecutor's comments about the 911 conversation were not based on the evidence. In that call, Smith described Petitioner. Later in the conversation, the

operator asked Smith if he knew who shot him, but all Smith said in response was "please get 17 here." The operator then explained that Smith could help police catch the person, and asked Smith if he "knew where the people are or no?" Smith did not answer, and did not speak further to the 911 operator.

Defense counsel and the prosecutor referred to the 911 call in their respective summations. Defense counsel suggested that Smith's failure to say specifically that it was Petitioner who shot him meant that Petitioner had not, in fact, shot him. He argued that Smith put down the phone, and then had a few minutes before the police arrived to think of a scheme to frame Petitioner.

The prosecutor countered this argument as follows:"I submit to you, unlike what [trial counsel] told you, that [Smith] passed out, he'd just been hit four times, he's bleeding. He drops the phone" (277). As soon as the police arrived Smith named Petitioner as the shooter. Smith had testified that he faded in and out while being treated. He also stated that he did not remember going to a car after he was shot (61, 64). It was a fair inference he did not answer the operator's question because he was unable, rather than unwilling.

The Court concludes this did not cross the line into improper summation, under the circumstances. Both counsel were permitted to set forth their arguments why Smith did not name the defendant, and its significance or lack thereof. It is not proper for the prosecutor to act as an unsworn witness, but here the prosecutor phrased the argument with the prefatory words, "I submit."

In sum, given the strong evidence of guilt presented a trial, Petitioner cannot establish that the challenged comments by the prosecutor, either standing alone or considered in

conjunction with the other alleged instances of prosecutorial misconduct, had a substantial and injurious influence in determining the jury's verdict. In other words, Davis cannot show that he was actually and substantially prejudiced by the prosecutor's alleged misconduct. It necessarily follows that he cannot demonstrate that he was prejudiced by counsel's representation in this regard because there is no reasonable probability of a different result had trial counsel objected to the prosecutor's summation.

### e.    Failure to Object to Testimony Regarding Bernard Brooks

As the fifth error on trial counsel's part, Petitioner claims that he should have moved to exclude Smith's testimony referring to the possible presence of Brooks in the Oldsmobile Alero. Such an objection had no likelihood of success, and Petitioner accordingly was not prejudiced by trial counsel's failure to so object.

### f.    Failure to Move for a Trial Order of Dismissal

Sixth, Petitioner asserts that trial counsel erred in not moving to dismiss the indictment at the close of the People's proof. When this claim was presented to the state courts on direct appeal, Petitioner's argument was limited to count four charging him with intimidating a victim or witness. The Appellate Division, despite the lack of preservation, analyzed the sufficiency of the evidence. Thus, Petitioner was not prejudiced by trial counsel's failure to preserve the claim of legal insufficiency by means of a timely motion for a trial order of dismissal.

### g.    Failure to Objection Variance Between Indictment and Proof

The seventh and final alleged errors is that trial counsel failed to object to the alleged variance in the proof with regard to count four. The indictment charged Petitioner with committing this crime on or about July 22, 2001.  The bill of particulars provided more precise

notice, and the People introduced evidence consistent with the bill that the defendant threatened

Smith over the telephone, from the holding center, on August 6, 2001.  In the final instructions,

the trial court referred to the indictment and stated that the crime allegedly occurred on or about

July 22, 2001. Notably, trial counsel did not object to the court's instruction, or ask that the jury

be instructed consistently with the bill of particulars. As Respondent points out, Petitioner cannot

establish that the trial court's instruction rendered the indictment defective or that the evidence

impermissibly changed the theory of the case or that he was deprived of adequate notice of the

charges.

The Second Circuit has referred to claims that evidence at trial did not conform to the

indictment as a "prejudicial variance," *United States v. Mucciante*, 21 F.3d 1228, 1236 (2d Cir.),

cert. denied, 513 U.S. 949, 115 S.Ct. 361, 130 L.Ed.2d 315 (1994) or a "constructive

amendment," *United States v. Attanasio*, 870 F.2d 809, 817 (2d Cir.1989) (citing *United States v.*

*Mollica*, 849 F.2d 723, 729 (2d Cir.1988)". A variance occurs when "the evidence adduced at

trial establishes facts different from those alleged in the indictment," and violates the Fifth

Amendment only when the defendant can demonstrate prejudice. *Mucciante*, 21 F.3d at 1236

(citing *Dunn v. United States*, 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979)).

"A variance is immaterial where the allegation and proof substantially correspond, where the

variance is not of a character that could have misled the defendant at the trial, and where the

variance would not deprive the accused of his right to be protected against another prosecution

for the same offense." *Kowalczyk v. United States*, 936 F. Supp. 1127, 1141 (E.D.N.Y. 1996)

(citing *Mucciante*, 21 F.3d at 1236).  Here, because time was not a material element of the

offense, this relatively minor variance in the proof would not have resulted in the sustaining of an

objection or the granting of a motion to dismiss this count of the indictment. Thus, Davis has not demonstrated that he was prejudiced by trial counsel's omission.

### I.    Summary

In sum, this Court finds that none of trial counsel's alleged errors or omissions, taken singly or cumulatively, were objectively unreasonable in light of prevailing professional standards of practice. Moreover, this Court remains unconvinced that even if trial counsel had performed as Davis wishes, there is a reasonable probability of a more favorable outcome. When a petitioner, such as Davis, cannot fulfill both prongs of the *Strickland* test, his ineffective assistance claim fails on the merits.

### C.    Ground Three: "Judicial Misconduct and Abuse of Discretion"

### 1.    Erroneous Admission of Father Boyer's Testimony

In support of Ground Three, Petitioner first alleges that the trial court erroneously permitted Father Boyer to give testimony that was more prejudicial than probative. Although Petitioner denominates this claim as one of "Judicial Misconduct", it instead alleges an error of evidentiary law. Whether under state or federal rules of evidence, the balancing of the prejudicial effect of certain evidence against its probative value is left to the sound discretion of the trial judge. *See*, *e.g.*, *United States v. George*, 266 F.3d 52, 63 (2d Cir.2001) (noting that the trial judge "is obviously in the best position to do the balancing mandated by Rule 403" and accordingly, has "'broad discretion' . . . to admit or exclude evidence pursuant to Rule 403.") (citations omitted); *People v. Sandoval*, 34 N.Y.2d 371, 375, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974)).

Here, Davis was accused of violating P.L. 215.15(1), which provides that "[a] person is

guilty of intimidating a victim or witness in the third degree when, knowing that another person possesses information relating to a criminal transaction and other than in the course of that criminal transaction or immediate flight therefrom, he: 1. [w]rongfully compels or attempts to compel such other person to refrain from communicating such information to any court, grand jury, prosecutor, police officer or peace officer by means of instilling in him a fear that the actor will cause physical injury to such other person or another person." N.Y. Penal Law 215.15(1). The prosecution argued that Petitioner instilled that fear by calling Smith on the telephone on August 6, 2001 (72), and telling him, "[Y]ou don't want your ass out on Front Street," which put Smith in fear for his life. After that call, Smith called his friend John Boyer, who was also an Episcopal priest.

According to Boyer, Smith sounded highly agitated and distressed (205). "He was in panic, his voice was trembling. I have never heard him in such a state" (206). The testimony was relevant evidence tending to demonstrate that Petitioner had successfully instilled fear in Smith. It was not cumulative evidence, as Respondent argues, since Father Boyer was the only person to testify about how Smith sounded on the telephone shortly after, according to Smith, Petitioner had threatened him.

In this Court's opinion, the testimony should have been admitted, not for the truth of Davis' statements, but as circumstantial evidence that Davis did, in fact, utter threatening words to Smith. Immediately following the brief testimony, the trial court properly instructed the jury that the purpose of the evidence was to demonstrate Smith's state of mind. The trial court told the jury that the source and the content of the threat, as related by Smith to Father Boyer, was "just a reference," and that its repetition was "not proof that the threats did indeed occur" (207-208).

Because the evidence was properly admitted, the trial court's limiting instruction was technically incorrect in Davis' favor.  *See McCormick on Evidence*, § 249 (4th ed. 1992).

The trial judge did not err in exercising his discretion in admitting Father Boyer's testimony since its probative value outweighed the potential prejudicial effect, given that Davis was accused of "instilling in [the victim] a fear" of testifying and Father Boyer's testimony about Davis' state of mind was relevant to the crime of victim-intimidation. *See United States v. Bicaksiz*, 194 F.3d 390, 396-97 (2d Cir. 1999) ('The Court held that the evidence of the threat was intrinsic to the crimes of conviction because it was part of the government's basic theory that the murder of the brother was intended to intimidate the wife. Had the alleged murder plot been successful, then under the government's theory the wife would have been made so fearful for her life based upon the threat to her and her brother and fortified by the murder of her brother that she would have relented from her position in the divorce proceedings. We agree that Bedriye's testimony at trial was probative of the government's contention that the projected murder of Esen was part of a scheme to intimidate Bedriye into accepting a disadvantageous divorce settlement, and we find no error, much less arbitrariness or irrationality, in the District Court's decision to admit it."). Davis has not demonstrated that his rights under either State or Federal law were violated. This claim accordingly does not provide a basis for habeas relief.

### 2.    Failure to Voir Dire Jurors

Petitioner's second allegation under Ground Three is that the trial court abused its discretion by not questioning the jurors as to whether they knew CO Hartman, who was added as a witness during the trial and whose name had not appeared on the witness list read to the jury during jury selection. There is no evidence that any juror knew CO Hartman. Even if the jurors

had, that would not invalidate his testimony or render the verdict suspect. In short, Davis has failed to impugn the impartiality of the jury which convicted him.

### D. Ground Four: "Due Process Violations"

#### 1. Unconstitutional Variance

Petitioner's first set of allegations under Ground Four relate to an alleged variance between the indictment and the proof in support of the witness intimidation charge (count four). As discussed above Section III.B.2.g, there was no unconstitutional variance between the indictment as amplified by the bill of particulars and the proof at trial.

#### 2. Sixth Amendment "Fair Cross-Section" Violation

Petitioner's second set of allegations under Ground Four pertain to alleged racial discrimination jury selection–namely, that he was deprived of his Sixth Amendment right to have the jury venire represent a fair cross section of the population. As discussed above in Section III.B.2.c, Petitioner failed to set forth a *prima facie* case under the Sixth Amendment's "fair cross-section" provision.

#### 3. Interference With Appellate Rights

Petitioner's third set of allegations under Ground Four pertain to the post-trial loss of the tape-recording of the 911 call made by the victim. He alleges that the appellate court was unable to effectively review his weight of the evidence challenge because the People were unable to find the trial exhibit containing the 911 conversation. By the time the appeal was perfected, the prosecution obtained what was in effect a duplicate original of that call. (The 911 system no longer erases or otherwise destroys the tapes.) The prosecution represented that the duplicate original tape had the same content, which could be demonstrated if the appellate court deemed

the tape necessary to resolve the weight of the evidence issue.

Respondent further argued that the tape of the 911 call was not essential for resolution of the weight-of-the-evidence issue. Although both counsel relied on the tape, there was no dispute about its contents. In his summation, defense counsel quoted from the tape: After reassuring Smith that help was on the way, the operator asked if Smith could help by answering questions. "Maybe they can catch him. Do you know where the people are or no?" (251). According to defense counsel, Smith did not respond. "Nothing. That's it. James Smith apparently puts down the phone. As far as we know from the evidence, he never lost consciousness, he simply put down the phone" (251). Trial counsel argued that Smith chose not to identify the shooter. He stated that Smith and Pecoraro had five minutes from the call's end to agree to pin the shooting on Petitioner before the police arrived.

The prosecutor in summation asked, "[W]hat does the 911 operator say? I think he dropped the phone" (277). While defense counsel wanted the jury to believe that Smith put down the phone, the prosecutor said "I submit to you, unlike what [trial counsel] told you, that he passed out, he'd just been hit four times, he's bleeding. He drops the phone" (277).

Respondent points out that the prosecutor and defense counsel agreed on the tape's content, but disagreed as to its meaning. I agree with Respondent that Petitioner's factual argument regarding the weight of the evidence–that Smith refused to identify a drug dealer who shot him, and then decided to frame Petitioner for the shooting in the minutes before the police arrived–is not enhanced by the tape. Thus, the state court's ability to review Davis' weight-of-the-evidence claim was not detrimentally affected. Certainly, no due process violation has been demonstrated on these facts.

E.    **Ground Five: "Insufficient Evidence"**

1.    **Erroneous Admission of CO Hartman's Testimony**

Petitioner's first set of allegations under Ground Five pertain to the introduction of testimony by Corrections Officer Jeffrey Hartman from the Erie County Holding Center that a three-way call was made by Petitioner to the victim's home. Hartman testified that on August 9, 2001, calls were placed at certain times from a telephone located in Petitioner's cellblock. Calls went to Petitioner's own residence, and to the victim's residence. Hartman explained that the phone system recognizes and then terminates attempts at what is known as three-way calling. With three-way calling, a called line can dial a third line to connect the first and third parties. A call from the cellblock to Petitioner's residence was terminated for three-way calling at around the same time that Smith testified he received a call from Petitioner.

Petitioner asserts that CO Hartman's testimony was "insufficient" because "he was not the engineer [sic] and should not have been able to testify about the phone system and how it works." Although Petitioner denominates this as a claim of "Insufficient Evidence", it really amounts to an assertion that the trial court abused its discretion in permitting CO Hartman's "opinion" testimony that a three-way call was made. However it is framed, it is plainly without merit. CO Hartman's testimony was relevant and properly admitted.

2.    **Verdict Against the Weight of the Credible Evidence**

Petitioner's second set of allegations under Ground Five pertain to witness credibility, or lack thereof–in particular, Smith and Pecoraro. Petitioner asserts that Smith was an admitted drug user and should not have been believed. In addition, Petitioner asserts that Pecoraro was unreliable because she was not able to identify Petitioner in a photo array. He also contends that

the rest of her testimony was unreliable because it allegedly differed from the sworn statement she gave to the police after the incident. In particular, Petitioner asserts, Pecoraro testified that she had seen him over forty times prior to the shooting (105) whereas she told the police that she met Petitioner on the night of the incident (127-29). Any claim by petitioner that a witness' testimony was unworthy of belief is not reviewable in habeas proceedings since credibility determinations are the province of the jury. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim because "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; stating that it must defer to the jury's assessments of both of these issues); *see also United States v. Vasquez*, 267 F.3d 79 (2d Cir. 2001) ( "The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility." ) (citing *United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998) ( "Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility. . . ."). Petitioner's attacks on Smith's and Pecoraro's credibility as witnesses do not provide a basis for habeas relief.

## VI.    Conclusion

For the reasons stated above, the Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition is dismissed.  Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ Hon Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     March 4, 2011
           Rochester, New York